UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Khan,

           Plaintiff,

      v.

S & C Electric Company,

           Defendant.

Case No.: 3:11-cv-03621-JCS

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Docket No. 47]**

## I.     INTRODUCTION

This is a disability discrimination case brought by Plaintiff Mohammad Khan (hereafter "Plaintiff") against his former employer S&C Electric Company (hereafter "S&C" or "Defendant").[1] Plaintiff alleges disability discrimination in the form of wrongful termination, failure to provide reasonable accommodation, failure to engage in an interactive process, and retaliation. Defendant has moved for summary judgment as to all Plaintiff's claims. The motion came on for hearing Friday, August 31, 2012 at 9:30am. Defendant asserts that Plaintiff is not a "qualified individual" because he could not work with high voltage electrical equipment, an essential function of his job. Plaintiff contends that this was not an essential function, and in any event, could have been reassigned to others. Because no reasonable jury could find that work with high voltage was not an essential part of Plaintiff's job, Defendant's Motion for Summary Judgment is GRANTED in its entirety.

---

[1] The parties have consented to the disposition of this case before a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.    BACKGROUND[2]

### A.    Overview of S&C Electric Company

Defendant is a global provider of equipment and services for electrical power systems. Joint Statement of Undisputed Facts (hereafter "JSUF") ¶ 5.  S&C is headquarted in Chicago, Illinois and maintains a facility in Alameda, California.  *Id.* ¶ 4.  S&C employed Plaintiff as a Senior Engineer in its Alameda facility from May 12, 2008 to October 4, 2010.  *Id.* ¶ 11. Between October 12, 2009 and October 4, 2010, Plaintiff was an active employee on disability leave.  *Id.* ¶ 56.

Before Plaintiff went on disability leave, Karen Rayment was S&C's Engineering Manager and Plaintiff's direct supervisor.  *Id.* ¶ 7; Declaration of Karen Rayment ("Rayment Decl.") ¶ 4.  Rayment voluntarily resigned from S&C on September 17, 2010, one month before Plaintiff's termination from employment.  Rayment Decl. ¶ 4.  During Rayment's time at S&C, she reported directly to Witold Bik, the Vice President of S&C's Automation Systems Division in Alameda, California.  JSUF ¶¶ 6-7; Declaration of Witold Bik ("Bik Decl.") ¶ 5.  At all relevant times, Jennifer Bermudez was S&C's Manager of Human Resources and Administration in Alameda.  JSUF ¶ 26; Declaration of Jennifer Bermudez ("Bermudez Decl.") ¶ 2.

### B.    Plaintiff's Job Responsibilities with S&C as a Senior Engineer

Senior Engineers at S&C are responsible for designing, building, testing and troubleshooting electric power systems for use in S&C's products.  JSUF ¶ 18;  *see also* Declaration of Steven L. Brenneman ("Brenneman Decl.") Exhibit ("Exh.") 3 (Job Snapshot). S&C's Job Snapshot provides a brief overview of a Senior Engineer's general job responsibilities

---

[2] Unless otherwise indicated, the Court relied on facts that the parties have stipulated are undisputed as well as those facts the Court found to be undisputed.

United States District Court
Northern District of California

at S&C. [3] Brenneman Decl. Exh. 3. The parties have also stipulated to the general workflow of a Senior Engineer's projects. *See* JSUF ¶ 21. Each Senior Engineer is first required to develop the design specifications of a project, then to build the hardware of the project with the design specifications, and finally, to test, troubleshoot and debug the hardware to ensure it meets the design specifications. *Id.* After these phases are complete, the project is released to production, where a Senior Engineer could be called to provide post-manufacturing product support. *Id.* ¶ 22.

In filling the role of Senior Engineer, S&C searched for someone who was able to perform all of the functions required of a Senior Engineer as an individual contributor, and as a sole specialist and practioner in his or her professional niche. *Id.* ¶ 17; Rayment Decl. ¶ 8. In making the decision to hire Plaintiff, Karen Rayment, S&C's Engineering Manager, evaluated Plaintiff based on his resume and the in-person interview she held with him. JSUF ¶ 16; Rayment Decl. ¶ 8. Rayment states that she hired Plaintiff based on his hands-on experience and abilities designing, testing and troubleshooting high voltage analog projects. Rayment Decl. ¶ 10. Plaintiff's resume reflects substantial work experience with high voltage and high wattage. *See* Rayment Decl. Exh. A (Plaintiff's resume).

Plaintiff was "responsible for designing, testing, and troubleshooting high voltage power systems for use in S&C's products, working exclusively with analog circuits and power supply design voltages above 220 volts." JSUF ¶ 18. Testing and analysis entails probing of signals on

---

[3] The Job Snapshot indicates that the position of "Senior Engineer" designs and manufactures distribution level voltage controller products for electrical utilities, and lists the job responsibilities as including, but not limited to: 1) Supporting the evaluation and qualification of current and emerging wireless technologies including testing and evaluation of all communication protocol layers; 2) Performing radio frequency (RF) pathway/interference/filtering analyses, radio/repeater location/system design, analysis, and, providing support; 3) Determining antenna selection and location, and performing interference studies; and 4) Performing customer site surveys, signal path analyses, and general radio system troubleshooting and tuning. Brenneman Decl. Exh. 3.

exposed, energized circuits.  *Id*. ¶ 23.  Senior Engineers must have specific education and training to know what to look for during the test and measurement processes, and how to troubleshoot and solve any design problems.  *Id.*

At the time Plaintiff went on disability leave in October 2009, he was working on four different projects.  *Id*. ¶ 32.  Plaintiff was in the testing phase of one project, TripSaver II Cutout-Mounted Recloser, which reached voltage levels of 215 to 225 volts.  Plaintiff was designing the PSIO project which would require hands-on testing and reach voltages up to 300-360 volts.  Plaintiff was the high voltage supply expert for another project, IntelliRupter PulseCloser, which was based in Chicago but required Plaintiff's assistance in the troubleshooting and testing phase.  Plaintiff was also working on the testing phase of his ESO project.  *Id.*

Despite the stipulated facts in the preceding paragraph, the parties disagree whether Plaintiff ever in fact worked on high voltage projects.[4]  On the one hand, S&C asserts that Plaintiff was required to test and troubleshoot circuits that carried more than 300 volts.  Rayment Decl. ¶ 19.  Rayment also states that Plaintiff was provided with equipment specific to his high voltage projects.  *Id.* ¶ 20.  On the other hand, Plaintiff states in his declaration that he "was never specifically required to nor did [he] ever perform any work with high voltage electrical equipment while employed by S&C."  Khan Decl. ¶ 4.  That, "[i]n particular, [Plaintiff] never worked with live circuits that carried 220 or more volts."  *Id.*  Plaintiff's conclusory assertions are contradicted, however, by his own deposition testimony and his stipulations in the Joint Statement of Undisputed Facts.[5]

---

[4] "High voltage" refers to 220 or more volts AC.  Although no evidence before the Court specifically defines "high voltage," the parties in various instances use the term to refer to 220 or more volts AC.  *See, e.g.*, JSUF ¶ 18; Khan Decl. ¶ 12.

[5] Defendant argues that Plaintiff's contradictory assertions in his declaration are "sham" testimony for the sole purpose of creating a genuine issue of material fact to survive Defendant's Motion for Summary Judgment.  Defendant's contention is addressed further below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

In his deposition, Plaintiff acknowledges that the highest voltage levels he worked with during his employment at S&C was "220 volts maximum," but asserts that most of the time he was working with 110 volts.  Brenneman Decl. Exh. 65 (Deposition of Mohammad Khan) (hereafter "Khan Depo.") 18:13-17.  Plaintiff also agrees that at the time he went on leave in October 2009, he was working on four design projects, three of which are "high voltage" projects. *See* JSUF ¶ 32.  Furthermore, Plaintiff stipulates that he was "responsible . . . for testing and troubleshooting high voltage power systems . . . working exclusively with analog circuits and power supply design voltages above 220 volts AC."  JSUF ¶ 18.

Before Plaintiff went on disability leave, there were four Senior Engineer positions in S&C's Electronics Hardware Engineering Group in Alameda: 1) a low voltage electronics position; 2) a digital chip (FPGA) design and development position; 3) a manufacturing support position; and 4) Plaintiff's high voltage analog power supply design position.  Rayment Decl. ¶ 17.  Rayment states that Plaintiff was the only Senior Engineer at S&C assigned to work exclusively with analog circuits and designing power supplies at voltages in excess of 220 volts AC.  *Id.*  The other three Senior Engineers, according to Rayment, worked on design projects and manufacturing issues that did not require the hands-on, high power analog power supply design knowledge Plaintiff possessed.  *Id.*

Rayment also declares that she required every Senior Engineer to be responsible for testing and troubleshooting their own project designs.  *Id.* ¶ 23.  Rayment's assertion is corroborated by Steven Webb, a Senior Engineer S&C hired in April 2010.  Declaration of Steven Webb ("Webb Decl.") ¶ 2.  Steven Webb states that "[w]hile [he] may not test and troubleshoot daily, [he] is required to test and troubleshoot each design [he] develop[s] before it is completed."  *Id.* ¶ 6.  Webb asserts that most of his design projects have the capacity to reach lethal voltages.

*Id.* at ¶ 7.  Webb also states that the safe testing and troubleshooting of high voltage power supply designs is an essential function of his job, and requires an alert and focused mind.  *Id.* at ¶ 9.

### C.    Plaintiff's Back Disabilities and Medical Leave

In June and July of 2009, Plaintiff was diagnosed with several back disabilities, including osteoarthritis in his cervical spine region, spinal stenosis in his lumbsar spine region, radiculitis/radiculopathy in his lumbosacral spine region, and a herniation of his intervetebral disc.  Khan Decl. ¶ 8.  On September 9, 2009, Plaintiff notified Defendant that he would have lumbar surgery and was immediately granted a leave of absence until September 28, 2009.  JSUF ¶¶ 27-28 and Brenneman Decl. Exh. 12 thereto.  Plaintiff did not return to work on September 28, 2009, but did submit his short-term disability paperwork from his doctor extending his time off until October 5, 2009, which Defendant approved.  JSUF ¶ 29.

Plaintiff worked the week of October 5 - 11, 2009, but thereafter, was on disability leave continuously until Defendant terminated Plaintiff's employment on October 4, 2010.  JSUF ¶ 30; Bik Decl. ¶ 14.  Plaintiff asserts that after his surgery, he requested S&C to reasonably accommodate his back disabilities by allowing him to work from home.  Khan Decl. ¶ 11.  He states that although Witold Bik initially agreed to this request, Rayment later rejected it.  *Id.*

Following Plaintiff's lumbar surgery, Plaintiff's condition did not improve and Plaintiff continued to suffer from extreme pain in his back and left leg.  *See* JSUF ¶¶ 36, 38, 41, 45-46, 48, 53, 60.  It was difficult for Plaintiff to sit for more than an hour, stand stationary for more than ten minutes, or lift more than five pounds.  *Id.* ¶¶ 53, 60.  Plaintiff's physician prescribed him Percocet, a narcotic pain medication used to treat significant pain.  JSUF ¶ 33; Khan Depo. 54:4.  Following his surgery, Plaintiff took four Percocet pills per day, each consisting of 250 milligrams.  JSUF ¶ 34; Khan Depo. 54:8-10.  Percocet can cause one to be sleepy, dizzy, and less able to control their thoughts.  JSUF ¶ 35; Brenneman Decl. Exh. 66 (Deposition of Steven A.

United States District Court
Northern District of California

6

Spisak, M.D.) 12:23-24; 13:1-6.  Plaintiff testified at his deposition that when he took large doses of Percocet, he would become nauseated and drowsy.  Khan Depo. 73:15-23.  Plaintiff's treating physicians did not want Plaintiff working with high voltage or heavy machinery while taking this narcotic pain medication.  JSUF ¶ 58.

On October 12, 2009, Plaintiff's doctor submitted a note stating that Plaintiff was unable to attend work through November 30, 2009.  JSUF ¶ 31; Bermudez Decl. ¶ 7 and Exh. C thereto. S&C approved an extension of Plaintiff's leave of absence through November 30, 2009.  *Id.* Subsequently, S&C received various doctors' notes stating that Plaintiff was unable to work, thereby extending Plaintiff's disability leave. JSUF ¶¶ 37, 39-40, 42, 47; Bermudez Decl. ¶ 8 and Exhs. D-J thereto.  Together, these doctors' notes stated that Plaintiff was unable to work continuously from October 12, 2009 to August 31, 2010.  *See id.*  Defendant states that it granted these extensions in the hopes that Plaintiff would be able to return to work.  Bik Decl. ¶ 14.

During the course of Plaintiff's leave, Plaintiff exchanged various emails and letters with Karen Rayment and Jennifer Bermudez, S&C's Manager of Human Resources and Administration.  Plaintiff expressed his desire to return to work with the condition of taking his pain medication.  Brenneman Decl. Exhs. 31, 33.  Plaintiff said that although he could not do high voltage testing and analysis, he could perform other job functions such as design, project management, calculations or instructing someone how to test the projects.  Khan Decl. ¶ 12 and Brenneman Decl. Exh. 31.  Nevertheless, S&C would not allow Plaintiff to return to work until his doctor cleared him to work with high voltage.  JSUF ¶ 58.  In one email sent on March 1, 2010, Bermudez specified that if Plaintiff wanted to return to work, it was "imperative" for Plaintiff's doctor to mention that he could "work with high voltage or 220 VAC."  Brenneman Decl. Exh. 31.  Plaintiff replied stating that he was taking Percocet three to four times a day, which meant that "220V" was "out of the question."  JSUF ¶ 43; Khan Decl. ¶ 12 and Brenneman

Decl. Exh. 31 thereto.  Throughout Plaintiff's leave, his physicians never authorized him to work

on high voltage due to the risks that are inherent in working with high voltage while taking

narcotic pain medication. *See* JSUF ¶ 58.

On August 12, 2010, Karen Rayment sent a letter to Plaintiff inviting him to meet in order

to discuss his absence from work.  JSUF ¶ 52 and Rayment Decl. Exh. C thereto.  Plaintiff

responded indicating that he could not meet on August 20, 2010 because he had a meeting with

the "Labor Department" that day.  Rayment Decl. Exh. D.  Specifically, Plaintiff wrote:

> While I am happy to see that you and the company are finally willing to speak to
> me as a valid employee and not just brush me off, as you have done in the past, the
> date, you have given to me to meet with you, will not be possible.  I have a
> meeting with the Labor Department I want to attend before meeting with you.

*Id.*  Rayment never responded to this letter.  Khan Decl. ¶ 15.  At the time of Plaintiff's

termination (discussed further below), Rayment was no longer employed as S&C's Engineering

Manager.  Rayment Decl. ¶ 4.  Witold Bik asserts in his declaration that at the time he terminated

Plaintiff's employment, he had no knowledge of Plaintiff's "Labor Department" remark.  *See* Bik

Decl. ¶ 21.

On August 31, 2010, Plaintiff sent an email to Jennifer Bermudez stating he intended to

return to work at S&C the next day.  JSUF ¶ 55; Khan Decl. ¶14; Bermudez Decl. ¶ 14 and Exh.

L thereto.  Attached to Plaintiff's email was a work authorization form in which Plaintiff's doctor,

Dr. Steven Spisak, M.D, wrote that Plaintiff was "[a]ble to do all work activities except work with

high voltage or heavy machinery that could result in significant injury."  Bermudez Decl. Exh. L.

Dr. Spisak also stated that "[i]f modified work is not available, Mohammad Khan is unable to

work for this time period."  *Id.*

Plaintiff did not return to work the next day because Jennifer Bermudez forwarded the

email to her supervisor, who indicated she needed time to review Plaintiff's medical documents.

Bermudez Decl. Exh. J.  S&C's Health Services Department requested that Karen Rayment prepare a job analysis to assist them in determining whether Plaintiff could return to work given the high voltage restriction from Plaintiff's doctor.  JSUF ¶ 55; Bermudez Decl. ¶ 15; Rayment Decl. ¶ 32 and Exh. E thereto.  In the job analysis, Rayment noted that Plaintiff worked with energized prototype equipment up to 220 volts AC power and 100 amperes.  Bermudez Decl. ¶ 15; Rayment Decl. ¶ 32 and Exh. E.

### D.    S&C's Termination of Plaintiff's Employment

On October 4, 2010, Witold Bik terminated Plaintiff's employment with S&C.  Khan Decl. ¶ 16; Brenneman Decl. Exh. 50.  Throughout Plaintiff's disability leave between October 12, 2009 and October 4, 2010, Plaintiff's doctors never released him to work with high voltage because Plaintiff was taking narcotic pain medication.  JSUF ¶¶ 56, 58.  At the time of his termination, Plaintiff had been on leave for almost one year and there was no indication from Plaintiff or his doctors that he would ever be released to work with high voltage.  *Id.* ¶¶ 59, 61. During Plaintiff's leave, S&C experienced delays due to Plaintiff's absence from work.  *Id.* ¶ 62. Plaintiff continued taking Percocet after his termination and was still taking Percocet at the time of his deposition, two and a half years after his termination.  *Id.* ¶ 64.

### E.    Plaintiff's Disability Benefits & ERISA Complaint

When Plaintiff's short-term disability payments from S&C were exhausted in March 2010, Plaintiff applied for long-term disability benefits through S&C's long-term disability insurer, Prudential Insurance. JSUF ¶ 44.  Prudential only approved Plaintiff's long-term disability benefits from March 11, 2010 through April 17, 2010.  *Id*. ¶ 68.  On October 25, 2011, Plaintiff filed an ERISA complaint against Prudential Insurance for wrongful denial of his long-term disability benefits.  *Id*. ¶ 74.  In his ERISA complaint, Plaintiff states that his "job required him to work with dangerous, high-voltage electrical equipment and it is not possible to perform this work

9

safely while under the influence of narcotic pain medications."  Brenneman Decl. Exh. 51.

Plaintiff also applied for and received California state disability benefits and federal Social

Security benefits.  JSUF ¶¶ 69-70.  Plaintiff received California state disability benefits from

approximately October 2009 to September 2010.  *Id.* ¶ 69.  Plaintiff also began receiving federal

Social Security benefits in late 2010.  *Id.* ¶ 70.  To qualify for state and federal disability benefits,

Plaintiff was required to certify that he was unable to perform his job during the period in which

he was receiving benefits.  *Id.* ¶¶ 69-70.

> **F.      Plaintiff's Complaint**

On September 8, 2010, Plaintiff filed a discrimination complaint against Defendant with

the Department of Fair Employment and Housing (DFEH).  JSUF ¶ 71; Brenneman Decl. Exh.

60.  Bik asserts that S&C only received notice of this complaint sometime after October 6, 2010,

when he received the DFEH's notice dated October 6, 2010.  Bik Decl. ¶ 21 and Brenneman Decl.

Exh. 61 thereto.  The DFEH closed Plaintiff's complaint on June 1, 2011 and issued a notice of

Plaintiff's right to sue. JSUF ¶ 72.

On June 27, 2011, Plaintiff filed a complaint in the Superior Court of the State of

California, County of Alameda.  JSUF ¶ 73 (*Mohammad Khan v. S&C Electric, a corporation*,

Case No. FG 11582556).  On June 22, 2011, Defendant timely removed the case to this Court.

Docket Number ("Dkt. No.") 1 (Defendant S&C Electric Company's Notice of Removal of Civil

Action to the United States District Court for the Northern District of California).

Plaintiff asserts four claims under California's Fair Employment and Housing Act

(hereafter "FEHA") against S&C concerning his employment.  Plaintiff alleges that Defendant

discriminated against him because of his disability in the form of: 1) wrongful termination in

violation of Cal. Gov't Code § 12940(a); 2) failure to provide reasonable accommodation in

violation of Cal. Gov't Code § 12940(m); and 3) failure to engage in the interactive process in

violation of Cal. Gov't Code § 12940(n). Plaintiff also claims Defendant retaliated against him in violation of Cal. Gov't Code § 12940(h). On July 13, 2012, Defendant S&C Electric filed a Motion for Summary Judgment as to all of Plaintiff's claims. Dkt. No. 47.

### G.    Defendant S&C's Motion for Summary Judgment

Defendant contends that all Plaintiff's claims fail as a matter of law. Defendant argues that Plaintiff's discrimination claim fails because Plaintiff cannot establish a prima facie case of disability discrimination, and in any event, cannot establish that Defendant's legitimate, non-discriminatory reason for his termination was pretext for discrimination. Defendant also asserts that it did reasonably reasonably accommodate Plaintiff's disability and engage in the interactive process. Finally, Defendant argues that Plaintiff's retaliation claim fails as a matter of law because Plaintiff cannot establish a prima facie case of retaliation and Plaintiff cannot establish that the legitimate, non-retaliatory reason given for his termination was pretext for retaliation.

In his Opposition, Plaintiff argues that although he was physically disabled as defined by FEHA, he was able to perform all of the essential functions of his position as a Senior Engineer at S&C. Specifically, Plaintiff argues that hands-on work with high voltage electrical equipment was not an essential function of his job. Plaintiff also argues that even if high voltage work were an essential function, Defendant could have accommodated Plaintiff by assigning such tasks to another employee. Plaintiff argues that Defendant did not engage in an interactive process to determine how it could accommodate Plaintiff's disabilities, and failed to provide a reasonable accommodation. Plaintiff states that Defendant wrongfully terminated Plaintiff's employment, and the termination was an act of retaliation after Plaintiff filed a complaint with the DFEH. Therefore, Plaintiff argues, there are triable issues of material fact which should preclude granting Defendant's Motion for Summary Judgment.

### III.    SUMMARY JUDGMENT -- LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact," that is, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation omitted). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

## IV. DISCUSSION

### A. Disability Discrimination under FEHA - Legal Standard

It is unlawful, under FEHA, for an employer "because of the . . . physical disability . . . of any person . . . to discharge the person from employment[.]" Cal. Gov't Code § 12940(a). California courts consider FEHA claims to be analogous to discrimination claims brought under Title VII and apply the burden-shifting framework developed by federal courts to address such claims. *See Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000).

Under that framework, the plaintiff must first establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The plaintiff must introduce evidence demonstrating that he: (1) has a disability; (2) is a qualified individual

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

for the position; and (3) has suffered an adverse employment action because of his disability.

*Swonke v. Sprint Inc.*, 327 F.Supp.2d 1128, 1133 (citing *Brundage v. Hahn*, 57 Cal.App.4th 228,

236 (1997)).  With regard to the second prong of the test, a person is a "qualified individual" only

if he is capable of performing the "essential functions" of his job with or without a reasonable

accommodation.  *Swonke*, 327 F.Supp.2d at 1133 (citing *Kennedy v. Applause, Inc.*, 90 F.3d

1477, 1481 (9th Cir. 1996)).  For purposes of summary judgment, a prima facie case requires the

plaintiff to "produc[e] enough evidence to permit the trier of fact to infer the fact at issue."  *Texas

Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n.7 (1981).  The burden of proving a prima

facie case is "not onerous."  *Id*. at 253.

Once a plaintiff has established a prima facie case, the burden shifts to the employer to

produce some evidence that it had a legitimate, non-discriminatory reason for the employment

decision.  *Watson V. Fort Worth Bank & Trust*, 487 U.S. 977, 985 (1988).  Once an employer has

produced such evidence, the plaintiff can survive summary judgment only by providing "specific,

substantial evidence of pretext."  *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).

## B.      Plaintiff is not a "Qualified Individual"

The parties do not dispute that Plaintiff has a disability within the meaning of FEHA.  The

central issue is whether Plaintiff is a "qualified individual" capable of performing all the

"essential functions" of his job with or without a reasonable accommodation.  *See Kennedy*, 90

F.3d at 1481.  More specifically, the issue is whether Plaintiff's work with high voltage, live

circuits is an essential function of his job.  The Court has considered the evidence submitted by

both parties, and concludes that no reasonable jury could find that Plaintiff's high voltage work

was not an essential function of his job.

Under FEHA, "essential functions" means the fundamental job duties of the employment

position the individual with a disability holds or desires, but does not include the marginal

functions of the position.  Cal. Gov't Code § 12926(f).  Evidence of whether a particular function is essential may depend on the employer's judgment, written job descriptions, the amount of time spent performing that function, or work experience of incumbents performing similar jobs. Cal. Gov't Code § 12926(f)(2).  A job function may be considered essential for any number reasons. For example, the position may exist for the very reason of performing that function.  Cal. Gov't Code § 12926(f)(1)(A).  There may be a "limited number of employees available among whom the performance of that job function can be distributed."  Cal. Gov't Code § 12926(f)(1)(B).  The function may also be "highly specialized, so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function."  Cal. Gov't Code § 12926(f)(1)(C).

Here, the undisputed facts indicate that Plaintiff's high voltage work was an essential function of his job.  Every Senior Engineer at S&C is required to do testing and analysis on their design projects before they are released to production.  JSUF ¶¶ 18, 21-22; *see also* Rayment Decl. ¶ 23; Webb Decl. ¶ 6.  Testing and analysis entails probing on exposed, energized circuits. JSUF ¶ 23.  Plaintiff was responsible for "testing[] and troubleshooting high voltage power systems . . . working exclusively with analog circuits and power supply design voltages above 220 volts AC."  *Id*. ¶ 18.  At the time Plaintiff went on disability leave, Plaintiff was working on at least two projects of 220V or more.  *See id*. ¶ 32.  Plaintiff's doctors would not authorize his work on high voltage electrical equipment while Plaintiff was consuming narcotic pain medication for his back disabilities.  *Id.* ¶ 58.  Plaintiff was never authorized to work with high voltage equipment following his surgery, nor was there any indication that this restriction would ever be lifted.  *Id.* ¶¶ 54, 56-59.  Therefore, Plaintiff's medication and medical advice from his doctors prevented him from performing the essential functions of his job.

Moreover, the undisputed facts show that Plaintiff's expertise and experience with high voltage is the very reason S&C decided to hire him.  *See* § 12926(f)(1)(B)-(C) (a job function

may be essential because it was the reason the individual was hired or because the function is not easily reassigned). Plaintiff's supervisors have declared under oath, and Plaintiff does not dispute, that he was hired because he had the high voltage experience S&C needed in a Senior Engineer. *See* Rayment Decl. ¶ 10; Bik Decl. ¶ 19. Before Plaintiff's leave, there were only three other Senior Engineers working in the Alameda facility. Rayment Decl. ¶ 17. Of the four Senior Engineers, only Plaintiff had expertise in analog circuits and design power supplies at voltages in excess of 220 volts AC. *Id.* Thus, Plaintiff's high voltage job responsibilities could not be easily reassigned. Furthermore, Plaintiff has stipulated to the fact that S&C decided to hire him based on his resume, *Id.* ¶ 16, and Plaintiff's resume indeed reflects a substantial amount of experience with high voltage equipment. *See* Rayment Decl. ¶¶ 17-18 and Exh. A thereto (Plaintiff's resume). Plaintiff was therefore hired to perform a highly specialized function which, once taking his pain medication, Plaintiff was no longer able to perform. This is further evidence that high voltage work was an essential function of Plaintiff's job.[6] *See* Cal. Gov't Code § 12926(f)(1)(B)-(C).

Plaintiff argues that even if high voltage work is a requirement of his job, it is not an essential function because he never in fact performed any high voltage work during his tenure at S&C. The Court rejects this argument on two grounds. First, even if Plaintiff never in fact worked on high voltage equipment, it would still be an essential function of his job because it was

_____

[6] Plaintiff's argument that S&C's Job Snapshot proves that high voltage work was not an essential function is unavailing. It is true that the Job Snapshot omitted the precise words "high voltage" when describing the functions of a Senior Engineer. It is also true that a written job description is evidence of whether a particular job function is essential. *See* Cal. Gov't Code § 12926(f)(2)(B). Here, however, the Job Snapshot is vague with regard to high voltage responsibilities, describes the position of every Senior Engineer as opposed to Plaintiff's position in particular, and states that Senior Engineers are responsible for "testing" and "performing . . . analyses." *See* Brenneman Decl. Exh. 3. The Job Snapshot therefore does more to support Defendant's argument that the functions described therein necessarily require Plaintiff to perform testing and analysis on high voltage, live circuits.

a required function.  *See Carroll v. Holder*, 2011 WL 7091804, at *28 (D. Or. Sept. 30, 2011) *report and recommendation adopted*, 2012 WL 214599 (D. Or. Jan. 24, 2012).  In *Carroll*, a Federal Bureau of Investigation (FBI) agent was unable to carry a firearm, a requirement of FBI agents, after she developed carpal tunnel syndrome in her left arm.  *Id.* at *9.  The court held that carrying a firearm was an essential function despite the fact the agent had never had to use a firearm as part of her job.  *Id.* at *28.  The same reasoning applies here.  Even if Plaintiff had never reached the testing phase of his design projects at the time he went on disability leave, the workflow of Plaintiff's design projects would have required him to conduct testing and analysis before the projects were complete.  JSUF ¶¶ 21-22.  Thus, under the circumstances, the fact high voltage work was required of Plaintiff makes it an essential function regardless of whether Plaintiff had actually performed that function.

The Court also rejects Plaintiff's argument because Plaintiff's own deposition testimony contradicts his statement in his declaration that he never performed high voltage work at S&C.  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  This rule must be applied with caution, however, because it cannot be asserted against a "contradictory affidavit [] introduced to explain portions of earlier deposition testimony."  *Id.* at 267.  Before disregarding contradictory statements in an affidavit, "the district court must make a factual determination that the contradiction was actually a 'sham.'"  *Id*.

Here, Plaintiff states in his declaration that he "was never specifically required to nor did [he] ever perform any work with high voltage electrical equipment while employed at S&C.  In particular, [he] never worked with live circuits that carried 220 or more volts."  Khan Decl. ¶ 4.  This statement flatly contradicts Plaintiff's admission in his deposition (taken before his declaration) that he occasionally worked with over 220 volts.  Khan Depo. 18:13-17 ("I work with

220 volts maximum, but most of the time I was working with 110 . . . .").  Plaintiff's deposition

testimony is further bolstered by his stipulations that "he was responsible for . . . testing and

troubleshooting high voltage power systems . . . working exclusively with analog circuits and

power supply design voltages above 220 volts[,]" and that testing and analysis "entails probing of

signals on exposed, energized circuits[.]  JSUF ¶¶ 18, 32.  Plaintiff was also working on four

projects the time he went on leave, at least two of which were high voltage projects.  *See id.* ¶ 32.

Therefore, to the extent Plaintiff asserts in his declaration that he never performed high voltage

work while at S&C, the Court declares this statement a "sham" intended to "create" a genuine

issue of fact for trial.  *See Kennedy*, 952 F.2d at 266.  There is no evidence to suggest that

Plaintiff was trying to "explain" his earlier deposition testimony.  *See id.*  Plaintiff's own

statements and stipulations give the Court every reason to believe that Plaintiff was required to

work with high voltage electrical equipment, and although infrequent, in fact worked with high

voltage electrical equipment during his time at S&C.[7]

Moreover, Plaintiff is judicially estopped to the extent he asserts work with high voltage

was not a required function of his job.  The Ninth Circuit recently summarized the doctrine of

judicial estoppel in *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, No. 08-56552, 2012

WL 3743100, --- F.3d ---- (9th Cir. Aug. 30, 2012).  "Judicial estoppel generally prevents a party

from prevailing in one phase of a case on an argument and then relying on a contradictory

argument to prevail in another phase."  *Id.* at *6 (internal citations omitted).  "It is an equitable

---

[7] The Court emphasizes that even if Plaintiff's statement is not a "sham" designed to create a genuine issue of fact to preclude summary judgment, the Court would still grant summary judgment because whether Plaintiff in fact worked with high voltage is immaterial.  *See* Fed.R.Civ.P. 56(c) (any genuine issue of fact must be *material* to preclude summary judgment). Whether Plaintiff in fact had reached the stage of projects during his tenure where he would have worked with high voltage is immaterial because, as described above, high voltage is a required function of Plaintiff's position, and as such, is an essential function of the job.  *See Carroll*, 2011 WL 7091804, at *28.

doctrine invoked not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing fast and loose with the courts." *Id*. (internal citations omitted).

Here, Plaintiff filed an ERISA complaint asserting that he was unable to work at least in part because his "job *required* him to work with dangerous, high-voltage electrical equipment and it is not possible to perform this work safely while under the influence of narcotic pain medication." Brenneman Decl. Exh. 51 (emphasis added). In his declaration, Plaintiff asserts that he "was never specifically *required* to . . . work with high voltage[.]" Khan Decl. ¶ 4 (emphasis added). The Court finds these two positions clearly inconsistent. *See Marilyn Monroe*, 2012 WL 3743100, at *7 (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) ("a party's later position must be clearly inconsistent with its earlier position"). Although various stipulations suggest Plaintiff concedes his job required him to do high voltage testing and analysis, to the extent Plaintiff asserts this was not a requirement of the job, Plaintiff is judicially estopped.

Under the circumstances, work with high voltage was an essential function of the job, and no reasonable jury could conclude otherwise. This does not end the inquiry. A qualified individual is one that can perform the essential functions with or without a reasonable accommodation. The heart of Plaintiff's argument is that Defendant could have reassigned Plaintiff's high voltage duties to another employee at S&C, thereby providing Plaintiff with a reasonable accommodation. Plaintiff points to Steven Webb, who was, at the time of termination, a newly hired Senior Engineer at S&C experienced in high voltage testing and troubleshooting. *See* Webb Decl. ¶ 4. Plaintiff's contention that S&C could have provided a reasonable accommodation by reassinging his high voltage testing duties to Steven Webb is incorrect. A

"reasonable accommodation 'does not require an employer to exempt an employee from performing an essential function or to reallocate essential functions to other employees.'" *Dep't of Fair Employment and Housing v. Lucent Technologies, Inc.*, 642 F.3d 728, 744 (9th Cir. 2011) (citing *Dark v. Curry Cnty.,* 451 F.3d 1078, 1089 (9th Cir. 2006)).  Plaintiff does not dispute that every Senior Engineer at S&C is required to test and troubleshoot his or her own designs. Rayment Decl ¶ 23; Webb Decl. ¶ 6.  S&C was not required to shift Plaintiff's high voltage duties to another employee.  Further, since Plaintiff gave no indication that he would cease his consumption of pain medication and thereby be authorized to work on high voltage equipment, S&C may have had to restructure the work duties among the Senior Engineers indefinitely. FEHA does not place this burden on an employer.  *See Watkins v. Ameripride Servs.*, 375 F.3d 821, 828–29 (9th Cir. 2004) (FEHA does not require that the employer create a new position for an employee or a temporary light-duty assignment where no such position existed previously). Accordingly, no reasonable accommodation would have enabled Plaintiff to perform the essential functions of his job.

Thus, Plaintiff has failed to establish a prima facie case of disability discrimination because he has not demonstrated he is a qualified individual.  This failure is fatal to Plaintiff's claims for wrongful termination, failure to provide a reasonable accommodation and failure to engage in an interactive process.

**B.     Plaintiff's Reasonable Accommodation and Interactive Process Claims Fail as a Matter of Law**

In Plaintiff's second and third causes of action, Plaintiff alleges S&C breached its duty to engage in an interactive process and provide Plaintiff with a reasonable accommodation in violation of Cal. Gov't Code § 12940(m)-(n).  As a threshold matter, these claims fail because Plaintiff has not demonstrated he is a qualified individual for his position at S&C.  *See Nadaf-*

19

*Rahrov v. Neiman Marcus Group, Inc.*, 166 Cal.App.4th 952, 978 (2008) (holding that 1) to prevail on a reasonable accommodation claim, "the plaintiff bears the burden of proving he or she was able to perform the essential functions of the job with accommodation"; and 2) to prevail on an interactive process claim, the plaintiff must show that a reasonable accommodation was possible). As discussed above, Plaintiff is not a qualified individual because he could not work on high voltage equipment, an essential function of his job, and no reasonable accomodation was available.

Plaintiff's reasonable accommodation and interactive process claims therefore fail as a matter of law. *Nadaf-Rahrov*, 166 Cal.App.4th at 978.

### C. Plaintiff's Retaliation Claim also Fails

In Plaintiff's final cause of action, he alleges that Defendant retaliated against him in violation of Cal. Gov't Code § 12940(h). In order to establish a prima facie case of retaliation under FEHA, Plaintiff must show: (1) that he engaged in a protected activity; (2) the employer subjected him to an adverse employment action; and (3) the existence of a causal link between the protected activity and the employer's action. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1042 (2005). "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, non-retaliatory reason for the adverse employment action. If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation." *Id.* (internal citations omitted).

#### 1. Plaintiff's Prima Facie Case

Defendants do not dispute that Plaintiff satisfies the first two prongs of his prima facie case of retaliation. Plaintiff engaged in protected activity when he met with the DFEH and filed a complaint against S&C for disability discrimination. *See Nidds v. Schindler Elevator Corp.*, 113

United States District Court
Northern District of California

F.3d 912, 919 (9th Cir. 1996) ("California law specifically prohibits employers from taking adverse actions against employees as a result of their filing a complaint alleging FEHA violations.") (citing Cal. Gov't Code § 12940(f)).  Plaintiff was subject to an adverse employment action when his employment with S&C was terminated.  *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004) (holding that termination is an adverse employment action).  Plaintiff's prima facie case therefore turns on whether there was a causal link between the protected activity and the adverse employment action.

Plaintiff alleges a causal connection on two bases.  First, Plaintiff filed his complaint with the DFEH on September 8, 2010, one month before S&C terminated his employment.  *See* JSUF ¶ 71.  Second, before Plaintiff filed his complaint, he had informed Karen Rayment that he would be meeting with the "Labor Department."  *See* Rayment Decl. Exh. D.  Defendant contends that neither of these bases establish a causal link because at the time S&C made the decision to terminate, no one at S&C knew about the DFEH complaint or about Plaintiff's "Labor Department" comment to Rayment.

The extent of S&C's knowledge of Plaintiff's engagement in protected activity is key to Plaintiff's prima facie case.  "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."  *Lockett v. Bayer Healthcare*, No. 05-03978, 2008 WL 624847, at *10 (N.D. Cal. Mar. 3, 2008) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).  In *Lockett*, the only person who knew the plaintiff had engaged in protected activity was not involved in the decision to terminate the plaintiff's employment.  *Lockett*, 2008 WL 624847, at *10.  Because the plaintiff did not present any evidence that this person had communicated his knowledge to anyone else, the court found that there was insufficient evidence to defeat the defendant's motion for summary judgment.  *Id.*

This case is analogous to *Lockett*. First, with regard to Plaintiff's actual DFEH complaint, Plaintiff has not presented any evidence that at the time S&C terminated his employment, anyone at S&C was aware that Plaintiff had filed a complaint. Plaintiff filed the complaint on September 8, 2010. JSUF ¶ 71. Although S&C terminated Plaintiff's employment shortly after on October 4, 2010, the DFEH only issued a notice of complaint on October 6, 2010, two days *after* S&C had informed Plaintiff of its decision. *See* Brenneman Decl. Exh. 61. Plaintiff has presented no evidence to show that S&C was otherwise informed of the complaint, and Witold Bik declared that he was unaware of the complaint before receiving the notice from the DFEH. Bik Decl. ¶ 21. Thus, like in *Lockett*, Plaintiff has pointed to no evidence from which a reasonable jury could find that Plaintiff's filing of his DFEH complaint triggered S&C's decision to terminate his employment.

However, with regard to Plaintiff's "Labor Department" comment to Karen Rayment, Plaintiff has presented evidence to establish a prima facie case of retaliation. In response to Rayment's request that Plaintiff meet with her on August 20, 2010 to discuss his employment, Plaintiff wrote in a hostile tone that he had "a meeting with the Labor Department" he wanted to attend before meeting with Rayment. *See* Rayment Decl. Exh. D. Defendant contends that there is no causal link between this comment and its decision to terminate Plaintiff's employment because at the time of S&C's decision, Rayment no longer worked at S&C. Admissible evidence suggests, however, that Rayment was involved, at least indirectly, in the decision to terminate Plaintiff's employment. *See Whitley v. City of Portland*, 654 F.Supp.2d 1194, 1216-17 (D. Or. 2009) ("if one with discriminatory animus infects [an adverse employment] decision, that decision will be illegal even though the employee with animus does not have the ultimate decision making power") (internal quotations omitted). Rayment was Plaintiff's direct supervisor and frequently communicated with Plaintiff regarding his return to work. JSUF ¶¶ 7, 45, 49.

Rayment also prepared the job analysis to determine if Plaintiff's work restrictions were compatible with his continued employment. *Id*. ¶ 55. Furthermore, the decision to terminate Plaintiff's employment came less than two months after Plaintiff's comment in August. *See Taylor v. City of Los Angeles Dep't of Water & Power*, 144 Cal.App.4th 1216, 1235 (2006) ("Close proximity in time of an adverse action to an employee's resistance or opposition to unlawful conduct is often strong evidence of a retaliatory motive."). Thus, Plaintiff has succeeded in establishing a prima facie case of retaliation.

### 2. Plaintiff Cannot Establish that Defendant's Legitimate, Non-Retaliatory Reason is Pretext for Retaliation

"[A] plaintiff cannot defeat summary judgment simply by making out a prima facie case." *Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir. 1991); *see also Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-91 (9th Cir. 1994) (holding that when evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate). To demonstrate that the employer's reason is pretext, a plaintiff may either show that the employer's proffered explanation is "unworthy of credence" or persuade the court that a retaliatory reason "more likely motivated the employer." *Hernandez v. Arizona*, 702 F.Supp.2d 1119, 1125 (D. Az. 2010) (citing *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1123-24 (9th Cir. 2000)).

S&C's legitimate, non-retaliatory reason for terminating Plaintiff's employment was that it needed a Senior Engineer who could perform the essential functions of the position -- Defendant needed a Senior Engineer who could test and troubleshoot high voltage electrical equipment. Defendant waited almost year for Plaintiff's doctors to authorize him to work with high voltage equipment. Once Plaintiff submitted a work authorization form that still restricted him from high voltage work, S&C terminated Plaintiff's employment because this was the very function Plaintiff was hired to perform. Although Plaintiff may have a prima facie case for retaliation, Plaintiff has

failed to present any evidence of pretext, much less "specific" and "substantial" evidence to permit a reasonable jury to find that S&C's reason for terminating his employment was retaliatory. *Hernandez*, 702 F.Supp.2d at 1126. Plaintiff's retaliation claim therefore fails as a matter of law. *See id.*

V.      **CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary is GRANTED in its entirety.

IT IS SO ORDERED.

Dated: September 14, 2012

_____
Joseph C. Spero
United States Magistrate Judge

United States District Court

24